IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| James R. Edens, | ) | |
| | ) | Case No. 14 CV 50056 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| John O'Brien et al., | ) | Judge Philip G. Reinhard |
| | ) | |
| Defendants. | ) | |

# ORDER

For the following reasons, defendants' motions for summary judgment [123]; [127]; [134] are granted. The case is terminated.

# STATEMENT/OPINION

This matter arises out of plaintiff James R. Edens's 42 U.S.C. § 1983 allegations of deliberate indifference with regard to his dental care against defendants Wexford Health Sources, Inc., Dr. John O'Brien, Dr. John Crisham, Warden Nedra Chandler, Tina O'Brien, and Louis Shicker. *See* [64]. Currently before the court are several motions for relief as set forth below.

On January 29, 2016, defendant Dr. John Crisham filed a motion for summary judgment [123], memorandum in support [126], and Rule 56 statement of facts [125]. On February 1, 2016, defendants Wexford Health Sources Inc., Tina O'Brien, and Dr. John O'Brien filed a joint motion for summary judgment [127], memorandum [133], and Rule 56 statement [128]. Also on February 1, defendants Louis Shicker and Nedra Chandler filed a joint motion for summary judgment [134], memorandum [136], and Rule 56 statement [135].

On March 15, 2016, plaintiff James R. Edens filed a response to the various motions for summary judgment [142], as well as his Rule 56 response and additional facts to Dr. Crisham [143], Wexford, Tina O'Brien, and Dr. O'Brien [144], and Louis Shicker and Nedra Chandler [145]. On April 25, 2016, Dr. Crisham filed his reply [153] and Rule 56 response [154]. On April 26, 2016, Wexford, Tina O'Brien, and Dr. O'Brien filed their reply [160] and Rule 56 response [156]. The foregoing matters are now ripe for the court's review.

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections,* 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine

the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Here, all defendants have moved for summary judgment based, in part, on plaintiff's failure to exhaust his administrative remedies. Because the court ultimately agrees that plaintiff has failed to exhaust, only a focused examination is necessary with regard to the undisputed facts located in the parties' Local Rule 56.1 Statements of Material Fact with respect to each motion. In so doing, the court is cognizant of its obligation to construe all disputed and undisputed facts in the light most favorable to the plaintiff. *See Schepers*, 691 F.3d at 913. This is particularly true where the court contemplates ruling without the benefit of a *Pavey* evidentiary hearing, which is designed to resolve contested issues of fact surrounding exhaustion. *See Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016).

**A. FACTUAL BACKGROUND.**

As noted, plaintiff's claims in this case relate to alleged deficiencies in his dental care, specifically the defendants' failure to supply him with new dentures. Defendants argue that summary judgment is proper because plaintiff failed to exhaust his administrative remedies and properly bring a grievance through all required stages of review.

The relevant grievance procedure is explained in the affidavit of Thomas Scott Keen, the Chairperson with the Office of Inmate Issues for the Illinios Department of Corrections and the Administrative Review Board ("ARB") Chairperson. *See* [128-5] at ¶ 1. In his affidavit, Keen explains that inmates incarcerated within the IDOC may file grievances in accordance with "Department Rule 505F: Grievance Procedures for Committed Persons." [128-5] at ¶ 2; *see* 20 Ill. Adm. Code 504.800-870. Generally, an inmate should first attempt to resolve a grievance informally through his counselor; if the grievance remains unresolved, the inmate may submit a written grievance on a grievance form within 60 days after discovery of the incident to the facility Grievance Officer designated by the Chief Administrative Officer ("CAO"). [128-5] at ¶ 2; *see* 20 Ill. Adm. Code 504.810(a). The Grievance Officer will investigate the grievance and forward conclusions to the CAO or the CAO's designee, who will submit a decision to the grieving inmate. [128-5] at ¶ 5; *see* 20 Ill. Adm. Code 504.830. If the inmate feels the issue is unresolved, he may appeal in writing to the ARB within 30 days of the CAO's decision, submitting the Grievance Officer's report and the CAO's decision. [128-5] at ¶ 6; *see* 20 Ill. Adm. Code 504.850(a). The ARB will investigate the grievance and submit a report and recommendation to the Director or designee, who will review the report and make a final determination on the grievance. [128-5] at ¶¶ 7-10; *see* 20 Ill. Adm. Code 504.850.

In certain cases not relevant here, grievances may be submitted directly to the ARB. *See*

[128-5] at ¶ 11; *see* 20 Ill. Adm. Code 504.870. In addition, the inmate may initially bypass the first several steps and request that a grievance be handled on an emergency basis by forwarding the grievance directly to the CAO, rather than a counselor or grievance officer. [128-5] at ¶ 12; *see* 20 Ill. Adm. Code 504.840. If the CAO determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm, the grievance may be handled on an emergency basis; if the grievance is handled on an emergency basis, the inmate may appeal the CAO's decision directly to the ARB. *Id.*

Here, on April 26, 2013, plaintiff filed a written offender grievance for medical treatment to Warden Chandler and requested emergency treatment. [143] at ¶ 27. Plaintiff explained in the grievance that he had been in the Dixon Dental Unit for treatment when he complained to the staff that he needed a new partial denture to replace his old denture; in response, they quoted him a price of $250 for a new partial denture. [143] at ¶ 29. Plaintiff argued in the grievance that he should receive another partial denture for free. [144] at ¶ 53.

On May 13, 2013, Warden Chandler conducted an emergency review and determined that plaintiff's claim of an emergency was not substantiated; as such, she returned the grievance and instructed plaintiff that "an emergency is not substantiated. Offender should submit this grievance in the normal manner." [143] at ¶ 30; [125-14] at 2. Plaintiff did not follow Warden Chandler's instructions and file his grievance in the normal manner; instead, in May of 2013, he sent Warden Chandler's returned grievance directly to the Administrative Review Board. [143] at ¶ 31.

On July 1, 2013, the ARB sent plaintiff a Return of Grievance letter requesting that he provide: (1) a copy of his written offender's grievance, including his Counselor's response; and (2) a copy of the response to the offender's grievance, including the Grievance Officer's response and the Chief Administrative Officer's response. [143] at ¶ 32. According to the Keen Affidavit, "[i]n order for the ARB office to process and consider an inmate's grievance appeal as required under Section 504.850(b), the inmate must submit" the counselor's response, Grievance Officer's response, and CAO's response, and that when an inmate appeals "without first obtaining a procedurally required response from the counselor, Grievance Officer, or CAO, then the grievance form is returned to the inmate along with another form noting the procedural deficit." *See* [128-5] at ¶¶ 15, 17. The Keen Affidavit asserts that the ARB never received a Counselor's Response or Grievance Officer's Report, or any other grievances regarding plaintiff's dental issues. *See* [128-5] at ¶¶ 24-25.

Plaintiff received the ARB's response the first week of July 2013. [143] at ¶ 34. He did not follow the ARB's instructions and attempt to submit his grievance in the normal manner to obtain the requested documents; moreover, he did not respond to the ARB to explain that the requested documents were not forthcoming. *Id.* To date, plaintiff never attempted to follow the explicit instructions of Warden Chandler or the ARB and resolve or submit his grievance to his counselor or the Grievance Officer. [143] at ¶ 33. Plaintiff has not filed any grievance other than the April 26, 2013 grievance regarding his request for a partial denture.

3

## B. ANALYSIS

The parties disagree as to whether plaintiff exhausted his administrative remedies prior to brining suit in this action. "A prisoner cannot bring a cause of action under federal law regarding prison conditions 'until such administrative remedies as are available are exhausted.'" *Hernandez v. Dart*, 814 F.3d 836, 841 (7th Cir. 2016) (quoting 42 U.S.C. § 1997e(a)). "Federal courts strictly enforce this requirement, and a prisoner fulfills this duty by adhering to 'the specific procedures and deadlines established by the prison's policy.'" *Hernandez*, 814 F.3d at 842 (quoting *King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015)). The Supreme Court has recently reemphasized that strict exhaustion is mandatory, explaining that "the PLRA prevented a court from deciding that exhaustion would be unjust or inappropriate in a given case[,]" even where "a prisoner makes a reasonable mistake about the meaning of a prison's grievance procedures." *Ross v. Blake*, 136 S.Ct. 1850, 1858 (2016).

The Supreme Court has explained that "[e]xhaustion of administrative remedies serves two main purposes." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006).

> First, exhaustion protects administrative agency authority. Exhaustion gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures.
> Second, exhaustion promotes efficiency. Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court. In some cases, claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court. And even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration.

*Id.* (internal quotations and modifications omitted).

When determining whether an inmate has exhausted administrative remedies, "the applicable procedural rules" that a court looks to "are defined not by the PLRA, but by the prison grievance process itself" and "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). An inmate exhausts only after "using all steps that the [prison] holds out, and doing so *properly* (so that the [prison] addresses the issues on the merits)." *Woodford*, 548 U.S. at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). Properly using the grievance process means complying with the prison's procedural rules, "because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. "The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules." *Id.* at 95.

4

Strict compliance with a prison's grievance process is not required in cases where it is impossible to navigate in practice. The Supreme Court recently explained that "[w]hen rules are so confusing that no reasonable prisoner can use them" or the process is "essentially 'unknowable' – so that no ordinary prisoner can make sense of what it demands[,]" then "they're no longer available." *Ross*, 136 S.Ct. at 1859 (internal quotations omitted). However, "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Id.* Recognizing that "exhaustion requirements are designed to deal with parties who do not want to exhaust," the Supreme Court has cautioned against overly lenient interpretations of exhaustion that would enable "a prisoner's deliberate strategy" to circumvent grievance procedural requirements "so that the litigation of the prisoner's claim can begin in federal court." *Woodford*, 548 U.S. at 88.

Here, defendants' claim that plaintiff did not exhaust remedies because he "failed to follow proper procedures." Specifically, defendants argue that plaintiff was not entitled to appeal Warden Chandler's denial of his emergency grievance. In analyzing this issue, the court is guided by four Seventh Circuit cases analyzing the exhaustion requirement in the context of plaintiffs who filed emergency grievances.

In the first case to confront the issue, *Thornton v. Snyder*, 428 F.3d 690 (7th Cir. 2005), the plaintiff filed an emergency grievance regarding the conditions of his cell. The plaintiff filed an emergency grievance with the warden, who denied emergency status. Following this denial, the plaintiff was moved out of the problematic cell and subsequently filed a federal action. The defendants claimed that the plaintiff had not exhausted administrative remedies because he never filed a normal grievance, arguing "that [the plaintiff] did not even begin the grievance process for his claim concerning the conditions in Cell 106. The defendants contend that after corrections officials deemed the grievance not an emergency, the grievance ceased to exist." *Id.* at 694. The court disagreed, noting first that filing an emergency grievance request with the warden was proper under the Illinois Administrative Code, and that "[t]here is nothing in the current regulatory text . . . that requires an inmate to file a new grievance after learning only that it will not be considered on an emergency basis." *Id.* Further, the court noted that "even if the non-emergency determination was a decision that should have been appealed," the plaintiff had been moved from his cell before the time expired for an appeal, thus obtaining the relief he sought, and as such any appeal would have been moot.

The next case to confront the issue was *Bulmer v. Young*, 160 F. App'x. 524 (7th Cir. 2005), where again the plaintiff had filed an emergency grievance regarding his diet and the warden denied emergency status, directing him to resubmit the grievance in the normal manner. The plaintiff forwarded the grievance to the ARB, writing on it "this is an emergency," and simultaneously resubmitted his grievance in the normal manner. *Id.* at 528. The appeal was apparently never acted upon, but the resubmitted grievance was denied through the normal channels and ultimately by the Director and ARB. However, plaintiff filed suit in federal court while the resubmitted grievance was still pending. Defendants claimed that plaintiff therefore did not fully exhaust. Plaintiff countered that his appeal of the denial of emergency status was sufficient to exhaust administrative remedies and that the prison had foreclosed remedies by

5

failing to act on it. The court disagreed with plaintiff's arguments. First, with regard to the plaintiff's contention that the prison had left no remedies available to him, the court noted "that [while] inmates must exhaust only those remedies that are available . . . there was a remedy available to [the plaintiff]: the grievance liaison officer advised him to refile his February 2002 emergency grievance as a routine grievance, and he did." *Id.* at 527.

Further, the court was skeptical that plaintiff's appeal of the emergency grievance was a proper use of the prison's grievance system, noting that the plaintiff "produced no evidence to counter the affidavit testimony of the ARB chairperson, who explained that an inmate must pursue a grievance that has been denied emergency status by resubmitting it for processing as a routine grievance. And inmates must follow the prison's rules for exhausting their claims." *Id.* To the extent the plaintiff was attempting to appeal the denial of emergency status, the court noted that simply writing "this is an emergency" on the grievance was insufficient to alert the ARB to the nature of his appeal. Even if the appeal was proper, the court explained that:
> Moreover, an appeal as to whether the grievance should have been treated as an emergency, if successful, logically would have resulted in expedited handling of the grievance by the grievance officer and chief administrative officer at [the prison], but would not have resolved the merits of the grievance. And it is the substance of the grievance, not the question whether it should be expedited as an emergency, that was required to be decided by prison administrators before [the plaintiff] turned to federal court.

*Id.* at 527-28. As such, the court found that "the undisputed evidence shows that no grievance was finalized before [the plaintiff] filed his complaint" and "[t]hus, prison officials lacked the opportunity to take corrective action concerning the diet provided to [the plaintiff] at [the prison] before incurring the hassle and expense of litigation." *Id.* at 528 (internal quotations omitted).

The next case to consider the issue was *Muhammad v. McAdory*, 214 F. App'x. 610 (7th Cir. 2007), in which the plaintiff filed an emergency grievance to the warden complaining of conditions in his wing of the prison. According to the plaintiff, the warden did not respond, so he submitted a copy of the emergency grievance with his grievance officer. When plaintiff did not get a response, he filed a copy of the emergency grievance to the ARB, which returned his grievance and told him to file it in the normal manner if the warden denied emergency status. However, the warden never responded to plaintiff's emergency grievance and the grievance officer never responded to the copy of the emergency grievance, the plaintiff eventually filed in federal court. The defendants claimed that the plaintiff failed to exhaust because he never filed a grievance in the normal manner, which they argued he was obligated to do after realizing that the warden was not going to grant emergency status. The *Muhammad* court disagreed. First, the court cited *Thornton* for the proposition that "an inmate who has requested that prison officials handle a grievance on an emergency basis under Title 20, § 504.840, of the Illinois Administrative Code is not required to resubmit that grievance through the standard procedure after the warden-the official responsible for acting on emergency grievances-concludes that the grieved condition is not an emergency." *Id.* at 612-13. The court noted that the defendants "offered no evidence to support their position that [the plaintiff] was obliged to refile his emergency grievance through the standard grievance procedure, and they fail to explain how

6

their position can be reconciled with § 504.840 and the reading we gave that provision in *Thornton*." *Id.* at 613.

The defendants in *Muhammad* contended that even if § 504.840 did not itself mandate resubmitting the grievance in the normal manner after the warden failed to grant emergency status, the plaintiff "was specifically instructed to follow the regular grievance procedure" by the ARB. *Id.* The court rejected this argument, holding that:
> This contention, however, mischaracterizes the explicit instruction [the plaintiff] received from the Administrative Review Board. The Board advised [the plaintiff] to follow the regular grievance procedure "if [the warden] denies emergency." The warden, though, never responded to [the plaintiff's] emergency grievance, so the condition precedent to using the regular procedure never came to pass. The Board expected [the warden] to act, and he did not. This is exactly the type of situation that renders an inmate's administrative remedy unavailable.

*Id.* at 613-14.

The final and most recent case to significantly confront the issue of exhaustion in the context of emergency grievances is *Glick v. Walker*, 385 F. App'x. 579 (7th Cir. 2010). In *Glick*, the plaintiff filed an emergency grievance regarding an assault by his cell mate, and again, the warden denied emergency review and instructed the plaintiff to resubmit the grievance in the normal manner. The plaintiff appealed this determination to the ARB, "which agreed with the warden that [the plaintiff] should have followed the standard, non-emergency protocol. The ARB told him to start over by submitting his grievance to the grievance officer at [the prison]." *Id.* at 583. However, following the ARB's determination, the plaintiff was transferred to another facility. As the court pointed out, "[a]n inmate who seeks to complain about an incident at a different prison is required to bypass the institutional level and submit the grievance directly to the ARB, [20 Ill. Admin. Code.] § 504.870(a)(4)[.]" *Id.* As such, "when [the plaintiff] received the ARB's directive to start over, he had already begun anew but by sending another copy of his grievance to the ARB. The ARB denied that filing as untimely." *Id.*

The court held that the plaintiff had exhausted his remedies, finding it relevant that "[t]he defendants offered no evidence to support their contention that [the plaintiff] was required to do something more after his emergency grievance had been rejected by the warden and by the ARB." *Id.* While the chairperson of the ARB asserted before the court that the plaintiff never properly submitted the grievance to the ARB, the court noted that she "did not cite a regulation, or a rule, or even a prison policy to support her assertion[.]" *Id.* The court concluded that
> As far as we can tell, [the plaintiff] did everything he was asked to do by the ARB, but, as far as [the PLRA] is concerned, one pass to the ARB was enough. The defendants' position that he was required to go back to the grievance officer and start over after his emergency grievance had been rejected by the warden and the ARB is at odds with 20 Ill. Admin. Code. § 504.840 and *Thornton v. Snyder*, 428 F.3d 690, 694 (7th Cir.2005). In *Thornton*, which the defendants fail to acknowledge, we explained that an inmate who seeks emergency review under § 504.840 has no obligation to resubmit the grievance through normal channels,

7

> even if the warden concluded that expedited review was unnecessary. The
> defendants cannot use the exhaustion requirement to demand that an inmate do
> more than what administrative rules require.

*Id.*

While the various outcomes appear to reveal tensions between *Thornton*, *Bulmer*, *Muhammad*, and *Glick* as to whether plaintiffs can exhaust remedies by appealing emergency grievances, it is possible to reconcile the different outcomes by the distinct evidentiary records in each case. In each case, the courts were concerned with what instructions the plaintiffs were given by the prison system and what evidence the defendants had proffered to the courts regarding what the grievance procedure rules surrounding emergency grievances actually were.

In *Thornton*, the plaintiff was provided no instructions by the prison system. *See Thornton*, 428 F.3d at 694 ("The response he received from the warden made no comment on the merits of the grievance and indicated only that the warden did not consider his complaint worthy of emergency treatment."). Likewise, the defendants did not present any evidence as to what the relevant rules were within the prison system; as such, the court was left with nothing but the Illinois Administrative Code itself, and so concluded that "[t]here is nothing in the current regulatory text . . . that requires an inmate to file a new grievance after learning only that it will not be considered on an emergency basis." *Id.* As such, *Thornton* stands for the proposition that a grievant is not required to resubmit an emergency grievance if given no other instructions and if there is no evidence that the prison system rules require it.

In *Bulmer*, there was evidence that the plaintiff had been specifically instructed by the warden to resubmit his grievance in the normal manner. *See Bulmer*, 160 F. App'x. at 527 ("[T]here was a remedy available to [the plaintiff]: the grievance liaison officer advised him to refile his February 2002 emergency grievance as a routine grievance, and he did."). Further, the court had evidence, in the form of an affidavit from the ARB chair, that the only proper response to the denial of an emergency grievance in that prison system was to resubmit it in the normal manner. *See id.* (the plaintiff "produced no evidence to counter the affidavit testimony of the ARB chairperson, who explained that an inmate must pursue a grievance that has been denied emergency status by resubmitting it for processing as a routine grievance. And inmates must follow the prison's rules for exhausting their claims."). As such, *Bulmer* stands for the proposition that a plaintiff must eventually resubmit an emergency grievance through the normal procedures where he has been specifically instructed that he must do so and there is evidence that the instructions are in conformity with the prison system's rules.

In *Muhammad*, while the plaintiff had been given instructions to resubmit his grievance in the normal manner if the warden denied his emergency grievance, the warden never responded at all, and as such "the condition precedent to using the regular procedure never came to pass." *Muhammad*, 214 F. App'x at 614. Further, the defendants "offered no evidence to support their position that [the plaintiff] was obliged to refile his emergency grievance through the standard grievance procedure[.]" *Id.* at 613. As such, the plaintiff found himself in the same factual position as that in *Thornton*, and the court thus concluded that he had exhausted because the

defendants "fail[ed] to explain how their position can be reconciled with § 504.840 and the reading we gave that provision in *Thornton*." *Id.*

Finally, in *Glick*, the warden in the first instance and the ARB on appeal both instructed the plaintiff to resubmit his emergency grievance in the normal manner. However, before he could do so, the plaintiff was transferred to another facility. After transfer, the "normal" manner to submit a grievance was to submit it to the ARB, which he did. True, this compliance with instructions does not appear to have been crucial to the court's analysis. The *Glick* court, interpreting the holding of *Thornton*, went on to find that even though the plaintiff had followed the ARB's instructions, "one pass to the ARB was enough" and the plaintiff was not "required to go back to the grievance officer and start over after his emergency grievance had been rejected by the warden and the ARB[.]" *Id.* This somewhat expansive reading of *Thornton* appears to be somewhat contradictory with the *Bulmer* court's finding that the plaintiff was required to follow the warden's instruction and resubmit his grievance. However, the tension may be reconciled to some degree by the fact that the *Bulmer* court had affidavit evidence that resubmitting was required, while the *Glick* court found it relevant that "[t]he defendants offered no evidence to support their contention that [the plaintiff] was required to do something more after his emergency grievance had been rejected by the warden and by the ARB." *Glick*, 385 F. App'x. at 583. While the chairperson of the ARB asserted that the plaintiff never properly submitted the grievance to the ARB, the court noted that she "did not cite a regulation, or a rule, or even a prison policy to support her assertion[.]" *Id.* While the instructions in *Glick* were unsupported by any regulation, rule, or policy, the instructions in *Bulmer* were supported by affidavit evidence that they conformed with the prison system's policies.

In this case, the undisputed facts are closer to the those in *Bulmer* than the facts in *Thornton*, *Muhammad*, and *Glick*. First, there is evidence in the form of the Keen affidavit that "[i]n order for the ARB office to process and consider an inmate's grievance appeal as required under Section 504.850(b), the inmate must submit" the counselor's response, Grievance Officer's response, and CAO's response, and that when an inmate appeals "without first obtaining a procedurally required response from the counselor, Grievance Officer, or CAO, then the grievance form is returned to the inmate along with another form noting the procedural deficit." *See* [128-5] at ¶¶ 15, 17. Like in *Bulmer*, here there is evidence that the prison's policy is not to entertain appeals of emergency grievances, and thus to follow proper procedures a grievant must resubmit his grievance through normal channels when the warden denies emergency status.

The court notes that the Keen affidavit is consistent with the underlying statute. As an initial matter, it is unclear from the record whether plaintiff intended to appeal the merits of his grievance or simply Warden Chandler's denial of his request for expedited emergency review. However, the Keen affidavit and the text of the statute suggest that neither form of appeal is contemplated by the Illinois grievance system. Because Warden Chandler did not make a decision as to the merits of plaintiff's grievance, a merits appeal of the grievance itself would essentially constitute direct review by the ARB. This would be improper, as there are only four instances where direct review is allowable, none of which exist here. *See* 20 Ill. Adm. Code 504.870. Further, the ARB's request for additional information appears to follow from its

9

interpretation of plaintiff's filing as a merits appeal, which it was unwilling to review without evidence of the prerequisite stages of review.

The only other basis for an appeal would be to challenge Warden Chandler's denial of emergency status. The fact that the ARB treated the filing as a merits appeal suggests, however, that interlocutory appeals of emergency status are not cognizable. Section 504.850, governing appeals, does not seem to contemplate interlocutory appeals:

> If, after receiving the response of the Chief Administrative Officer, the offender still feels that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director within 30 days after the date of the decision. Copies of the Grievance Officer's report and the Chief Administrative Officer's decision should be attached.

*See* 20 Ill. Adm. Code 504.840(a). While Section 504.850 purports to make appealable any "response" from the CAO, requiring the inclusion of the Grievance Officer's report and CAO's decision suggests that the ARB's only appellate function is to review merits decisions that have gone through the prerequisite stages of review. Further, emergency grievances are only mentioned in the section in cases where the CAO has treated the grievance as an emergency and disposed of it on the merits. *See* 20 Ill. Adm. Code 504.840(g). The remainder of the appeals section appears limited to the review of final merits decisions. *See* 20 Ill. Adm. Code 504.840(b) ("The Director shall review the grievance and the responses of the Grievance Officer and Chief Administrative Officer and shall determine whether the grievance requires a hearing" or "is without merit or can be resolved without a hearing"); 504.840(f) ("The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within 6 months after receipt of the appealed grievance[.]").

As with *Bulmer*, here there is plausible evidence that plaintiff was not following proper prison procedures when he appealed the warden's denial of emergency status. On the other hand, given the somewhat contradictory holding in *Glick*, along with the ambiguous nature of the Code, the court is hesitant to find that plaintiff failed to exhaust simply because appealed the warden's denial of emergency status. Regardless, while the Keen affidavit is not dispositive, it is evidence that weighs against exhaustion.

Also like in *Bulmer*, here the plaintiff was given specific instructions to resubmit his grievance in the normal manner by the warden, and like in *Glick*, he was again given the same instructions by the ARB when he appealed. Unlike the plaintiffs in both those cases, plaintiff here made no attempt to comply with either instruction. While plaintiff was arguably entitled to ignore Warden Chandler's directive to resubmit his grievance by filing his appeal, it would be contrary to Seventh Circuit precedent to find that he was entitled to ignore the ARB's instructions to submit additional information. Notwithstanding the fact that the *Glick* court did not rely solely on the plaintiff's cooperation to find exhaustion in that case, the Seventh Circuit has repeatedly held that lack of cooperation can doom an administrative grievance. In *Ford v. Johnson*, 362 F.3d 395 (7th Cir. 2004), the Seventh Circuit noted that where a prisoner filed an appeal to the ARB, the ARB asked for additional information, and the prisoner refused to provide it, he had abandoned his grievance. *See id.* at 397 (noting that "[s]imilar reasoning

10

supports dismissal of a civil suit for failure to prosecute. No rule of law requires a plaintiff to testify (or give a deposition) in his own suit, but failure to do so may justify a termination on procedural grounds without reaching the merits. Just as courts may dismiss suits for failure to cooperate, so administrative bodies may dismiss grievances for lack of cooperation; in either case this procedural default blocks later attempts to litigate the merits."). Moreover, in *Cannon v. Washington*, 418 F.3d 714 (7th Cir. 2005), the Seventh Circuit found that a grievant failed to exhaust remedies for an untimely grievance when he "ignored both of the ARB's instructions concerning the form of his response" and "fail[ed] to take advantage of the procedure offered by the ARB for reconsidering the grievance." *Id.* at 718; *see also Dole v. Chandler*, 438 F.3d 804, 811 (7th Cir. 2006) (recognizing that the plaintiff in *Cannon* had failed to exhaust because after his initial procedural error, "he did not follow the ARB's explicit instructions to rectify his original mistake").

Here, the ARB's explicit instructions called for some response. If plaintiff did not believe he was required to submit the requested documents because he only sought to appeal the denial of emergency status, he should have so informed the ARB and awaited a determination.[1] If he was attempting a merits review, he should have complied with the instructions by attempting to resubmit his grievance through the normal procedure. While plaintiff may believe that he did all that was required, what constitutes a proper appeal is not up to plaintiff; it is up to the prison. *See Strong v. David*, 297 F.3d 646, 649 (7th Cir. 2002) (holding that "grievances must contain the sort of information that the administrative system requires" and that "[i]t is up to the administrators to determine what is necessary to handle grievances effectively"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) ("Prisons are unlikely to entertain many appeals . . . by prisoners who . . . thumb their noses at the specified procedures.").

Plaintiff defends his failure to follow instructions by arguing that resubmitting his grievance would have been futile, because the time for filing a grievance had already passed when the ARB requested additional information. The Seventh Circuit has explained, however, that a late filing does not doom a grievance so long as good cause can be shown for the delay. *See Dole*, 438 F.3d at 807 ("Grievances must usually be filed within sixty days of the incident giving rise to the complaint, but the ARB reviews untimely grievances that include an

---

[1]If plaintiff was simply attempting to obtain emergency status, however, he should have been aware that even a successful appeal would necessitate returning to Warden Chandler to obtain a merits ruling, followed by a merits appeal to the ARB and Director. *See Bulmer*, 160 F. App'x. at 527-28 ("[A]n appeal as to whether the grievance should have been treated as an emergency, if successful, logically would have resulted in expedited handling of the grievance by the grievance officer and chief administrative officer at [the prison], but would not have resolved the merits of the grievance. And it is the substance of the grievance, not the question whether it should be expedited as an emergency, that was required to be decided by prison administrators before [the plaintiff] turned to federal court."). As such, plaintiff would be aware that filing in this court was premature.

11

explanation of good cause for the untimeliness. Ill. Admin. Code tit. 20, § 504.810(a).").

Here, plaintiff could have filed the grievance late and sought a good-cause exception based on his procedural attempts to resolve the emergency grievance with the ARB. If he had done so and the prison had refused to review his grievance, perhaps he would now have a viable argument that the prison's ambiguous emergency review process had made exhaustion unavailable for him. *See Dole*, 438 F.3d at 809 ("Prison officials may not take unfair advantage of the exhaustion requirement, however, and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting."). However, perceived futility is no excuse when procedural avenues remain available to a grievant; he must make the attempt. *See Thornton*, 428 F.3d at 694 ("An inmate's perception that exhaustion would be futile does not excuse him from the exhaustion requirement."); *Flournoy v. Schomig*, 152 F. App'x. 535, 537 (7th Cir. 2005) ("[A]lthough [plaintiff] argues generally that waiting for an answer to the inter-facility grievance was futile, he had to give the system a chance."); *Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 532, 536 (7th Cir. 1999) ("As for the possibility that administrative remedies could be declared futile ex ante, without ever being tried: what would be the point of asking judges to be seers? Then the simplicity of § 1997e(a) would be lost, and instead of requiring exhaustion of administrative remedies it would lead to guesswork about counterfactual situations. No one can know whether administrative requests will be futile; the only way to find out is to try.").

For the foregoing reasons, the court agrees with defendants that plaintiff did not follow instructions. Defendants argue that this finding should necessarily lead to dismissal; in other words, failure to exhaust through procedural default. One reason to hesitate before doing so is that courts typically only dismiss suits where the plaintiff has procedurally defaulted in another tribunal when default was the reason relied upon by that other tribunal in disposing of the matter. *See Ford*, 362 F.3d at 397 ("A procedural default in state proceedings is fatal to the litigation in federal court only if the state tribunal explicitly relies on that default."). Here, as plaintiff points out, the ARB has not dismissed his grievance appeal for failing to respond or submit the requested documents. As such, a finding of procedural default may be premature.

The court need not decide the issue here, because the pending nature of plaintiff's grievance appeal raises yet another fundamental reason why he failed to exhaust in this case. As the court has noted, after the ARB requested additional information, the onus was on plaintiff to either comply or respond. Because he did not do so, the ARB never issued a final decision on his appeal. By definition, a grievant has not exhausted administrative remedies until those remedies have run their course with a final decision. One common thread among the cases confronting emergency grievances analyzed above, *Thornton*, *Bulmer*, *Muhammad*, and *Glick*, is that in all of those cases the courts either required a final decision or allowed the plaintiff to proceed because the prison system had refused to respond to a grievance when the onus was on the system to respond. In *Thornton*, the prison gave the plaintiff the relief he requested. In *Bulmer*, the plaintiff's complaint was dismissed for failure to exhaust precisely because he had not obtained a final decision before filing in federal court. In *Muhammad*, the plaintiff was allowed to proceed because the warden never responded to the plaintiff's emergency grievance

12

despite the fact that the onus was on the warden to act. In *Glick*, the ARB dismissed the plaintiff's final grievance appeal.

As defendants point out, this case is strikingly similar to another decision from this district, *Faysom v. Timm*, 2005 WL 3050627 (N.D. Ill. 2005). In *Faysom*, the plaintiff appealed the denial of a grievance to the ARB but failed to respond when the ARB returned the grievance "to plaintiff with a request for 'additional information.'" *Faysom*, 2005 WL 3050627, at **2-3. The court found that the plaintiff had not fully exhausted his remedies because it was "clear that the ARB had made no final decision as of the time plaintiff filed this suit[.]" *Id.* While the plaintiff argued "that his actions were sufficient to 'alert the state' to his grievance and to 'invite corrective action,' and thus should be considered sufficient to satisfy the exhaustion requirement," the court noted that "accepting plaintiff's argument would transform the requirement of full exhaustion into one of partial exhaustion. We are not permitted to rewrite the PLRA in that fashion." *Id.* (internal citations and alterations omitted). Likewise, the Seventh Circuit has made clear that prisoner-litigants may not bring suit until they have received a final decision from prison administrators regarding grievance proceedings. *See Ford*, 362 F.3d at 398 ("[I]t is essential to keep the courthouse doors closed until those efforts have run their course."). By ignoring the ARB's request and initiating this lawsuit, plaintiff, like the plaintiff in *Ford*, " launched the suit while the administrative process was ongoing and then told the Board to go fly a kite." *Id.* at 399.

In arguing that he was not required to await a final decision, plaintiff cites *Lewis v. Washington*, 300 F.3d 829 (7th Cir. 2002) and argues that he was not required to exhaust remedies because they were not "available" to him. In *Lewis*, the Seventh Circuit noted that "[t]he Eighth and Fifth Circuits have deemed administrative remedies exhausted when prison officials fail to respond to inmate grievances because those remedies had become 'unavailable.'" *Lewis*, 300 F.3d at 833. The Seventh Circuit decided to "join the Eighth and Fifth circuits on this issue because we refuse to interpret the PLRA 'so narrowly as to . . . permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances.'" *Id.* (citing *Goodman v. Carter*, No. 2000 C 948, 2001 WL 755137, at *3 (N.D. Ill. July 2, 2001)). The Seventh Circuit has since clarified that *Lewis* stands for the proposition that "an inmate may file a lawsuit if it becomes apparent that the prison refuses to respond to a grievance." *Winder v. Sheahan*, 52 F. App'x. 833, 834 (7th Cir. 2002).

However, this does not mean that an inmate may file a complaint "while an administrative grievance appeal was still pending," particularly where "the district court could not properly conclude that the jail was delinquent in providing a response." *Winder*, 52 F. App'x. at 834. An inmate may not complain that his grievance has not been acted on after he has been given explicit instructions on how to proceed. *See Bulmer*, 160 F. App'x. at 527 ("[Plaintiff] is correct that inmates must exhaust only those remedies that are available, *see Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir.2002), but there was a remedy available to [plaintiff]: the grievance liaison officer advised him to refile his February 2002 emergency grievance as a routine grievance, and he did."). Here, as the court has already noted, plaintiff had several remedies available to him. As in *Bulmer*, he could have complied with the ARB's

instructions and resubmitted his emergency grievance through the normal procedure. Alternatively, if he felt his circumstances excused him from compliance, he could have responded to the ARB and informed them. The court cannot agree with plaintiff's contention that the prison administrators had "refused" to hear his grievance or were "delinquent" in not issuing a final ruling where the reason for their silence stemmed from plaintiff's failure to comply with or even acknowledge their explicit instructions.

Finally, plaintiff argues that the ARB has constructively issued a final decision because more than six months passed between his appeal to the ARB and his lawsuit in this court. He points out that Section 504.850(f) of the Code states that "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within 6 months after receipt of the appealed grievance, where reasonably feasible under the circumstances." *See* 20 Ill. Adm. Code 504.850(f). Plaintiff argues that because he waited more than nine months before filing this action on March 12, 2014, he was in full compliance and "the failures of the ARB and prison administration to issue a timely decision are either the result of negligence, incompetence, or at attempt to prevent [plaintiff] from seeking legal redress for his medical condition, despite his compliance." [142] at 7.

Despite plaintiff's contention, the Seventh Circuit in *Ford* explicitly rejected a substantially similar argument from the plaintiff in that case. As relevant to the court in *Ford*, which dealt with an appeal to the ARB of a prisoner grievance, "[a] regulation provides that decision will be rendered within 60 days of the appeal 'whenever possible.'" *Ford*, 362 F.3d at 400. The plaintiff in *Ford* contended that after "once 60 days have expired without a decision, the administrative process is no longer 'available' and the prisoner may start the litigation." *Ford*, 362 F.3d at 400. The court responded that "[t]hat's a non-sequitur. An aspiration to act 'whenever possible' does not mean that the prison system tosses out the papers and closes the files after two months," and "Section 1997e(a) applies to all grievances, not just to the simple ones. Illinois made a process available to [plaintiff]; he had to stick with that process until its conclusion rather than make a beeline for court just because the administrative officials gave his appeal the time needed to resolve it." *Id.* Likewise, here plaintiff was not entitled to file suit as soon as six months had passed; if nothing else, a decision within that time was not "reasonably feasible under the circumstances" since the reason for the delay was plaintiff's failure to follow the ARB's instructions or acknowledge that he was unable or unwilling to do so.

Ultimately, a finding for plaintiff in this matter would subvert both of the "main purposes" that the Supreme Court has articulated for the exhaustion requirement, both "protect[ing] administrative authority" and "promot[ing] efficiency." *Woodford*, 548 U.S. at 89. First, exhaustion is designed to "give[] an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and [discourage] disregard of the agency's procedures." *Id.* Here, plaintiff overtly disregarded the agency's procedures by failing to respond to the ARB's explicit instructions. Moreover, a finding for plaintiff would allow the prison system no chance to correct its own mistakes because it has not yet had the chance to review plaintiff's grievance on the merits. Again, it would be one thing if plaintiff had resubmitted the grievance and the prison system declined the opportunity to review

14

it on a technicality; it is quite another to hale the defendants into federal court without ever affording them that opportunity.

Second, exhaustion is intended to promote efficiency by first utilizing administrative proceedings that can resolve issues "much more quickly and economically" than federal litigation; these proceedings may settle the matter or "convince the losing party not to pursue the matter in federal court." *Id.* Further, "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Id.* Allowing plaintiff to proceed in this action would provide a roadmap for future litigants to exploit the grievance process and avoid any meaningful administrative proceedings, along with the efficiencies they provide. A prisoner could simply ask for emergency review, submit the emergency review denial to the ARB, and decline to respond to requests for additional information from the ARB. Thus, there would be no quick and economical merits review, no opportunity for settlement, and no meaningful record for judicial consideration.

The Supreme Court requires "proper" exhaustion precisely "so that the [prison] addresses the issues on the merits." *Id.* at 90. Otherwise, the requirement is simply a cumbersome waste of time and resources. Allowing litigants to create an end run around merits reviews would result in an exhaustion requirement that discards all the intended benefits while retaining the substantial costs. The court is reminded that the value of strict exhaustion lies in its deterrence of future litigants:
> Because of the advantages of administrative review, some aggrieved parties will voluntarily exhaust all avenues of administrative review before resorting to federal court, and for these parties an exhaustion requirement is obviously unnecessary. Statutes requiring exhaustion serve a purpose when a significant number of aggrieved parties, if given the choice, would not voluntarily exhaust. Aggrieved parties may prefer not to exhaust administrative remedies for a variety of reasons. Although exhaustion promotes overall efficiency, a party may conclude—correctly or incorrectly—that exhaustion is not efficient in that party's particular case. In addition, some aggrieved parties may prefer to proceed directly to federal court for other reasons, including bad faith.

*Id.* at 89-90. As such, the Supreme Court has recently admonished courts that they may not make individualized exceptions: "the PLRA prevented a court from deciding that exhaustion would be unjust or inappropriate in a given case[,]" even where "a prisoner makes a reasonable mistake about the meaning of a prison's grievance procedures." *Ross*, 136 S.Ct. at 1858.

For all the foregoing reasons, the court finds that plaintiff has failed to exhaust administrative remedies in this case and his action must therefore be dismissed. However, the dismissal is without prejudice. First, as both parties have pointed out, the ARB made no final decision as to plaintiff's appeal and plaintiff never attempted to follow the ARB's instructions by resubmitting his grievance. While "a reasonable mistake about the meaning of a prison's grievance procedures" may not save plaintiff from the exhaustion requirement in this court, it may yet prove an acceptable excuse for his late re-filing of the April 26, 2013 grievance. Further, even if it is too late to resubmit the April 26, 2013 grievance, plaintiff is not without

15

recourse. The nature of plaintiff's allegation is not a single injury which is now too late to challenge, but rather a continuing refusal to provide him with the dental treatment he needs. As such, plaintiff can simply file a new grievance and be in the same position as if he was allowed to resubmit the April 26, 2013 grievance in the proper manner.

Date: 8/09/2016          ENTER:

*Philip G. Reinhard*

United States District Court Judge

Electronic Notices.  (LC)